Demise of CHARLES H. PRETTYMAM *v.* WILLIAM CONAWAY, tenant in possession.

*Deed—Evidence—Presumption of death.*

A party setting up the death of another must show that he is dead in fact, or that a reasonable effort has been made and without success, to ascertain whether he is dead. After seven years without intelligence concerning the person the presumption of life ceases.

A deed, made by one of the devisees of an estate tail with remainder over to the survivor, evidencing an intent to convey to the grantee all the estate of the grantor but not using the necessary terms for a fee simple, will be held to convey an estate for the life of the grantee, that being the most beneficial estate to him.

(*Sussex, April, 1891.*)

EJECTMENT for the undivided two-thirds of about two hundred acres of land in Dagsboro hundred.

*C. W. Cullen,* for plaintiff.

*A. P. Robinson* and *William H. Boyce,* for defendant.

COMEGYS, C. J., charging the Jury:

Objection being made to the right to sue of the plaintiff's lessor, it is necessary first to consider and dispose of it. This depends upon a question of fact for the jury. Supposing him to have such right, the question is whether the right to recover is not barred by the act of limitations.

John Prettyman, a citizen of Sussex County, died in the year 1831, having first duly made and published his last will and testament, which after his death was proved and allowed according to law. Said will is without date, but was allowed by the register on the 20th day of December, 1831; and is in the following words:

In the name of God, Amen. I, John Prettyman, of Sussex county and State of Delaware, being sick and weak in body, but of sound mind, memory and understanding (praised be God for it)

and considering the certainty of death, and the uncertainty of the time thereof, and to the end I may be better prepared to leave this world whenever it shall please God to call me hence, do therefore make and declare this my last will and testament in manner following, that is to say, first and principally I commend my soul into the hands of Almighty God, my creator, hoping for free pardon and remission of all my sin, and to enjoy everlasting happiness in the Heavenly Kingdom, through Jesus Christ my Savior, and as to such worldly estate wherewith it has pleased God entrust me, I dispose of the same as follows, viz.:

I will to my wife Lurana one dollar and no more of my estate.

Secondly, I will to my eldest son Philip one shilling and no more of my estate.

Thirdly, I will to my son Nehemiah one shilling and no more of my estate.

Fourthly, I will to my son William the farm lying on the east side of the county road leading from the head of Nanticoke river to Dagsborough, beginning at a marked white oak corner standing near a causeway on said road, thence with said road up to John Roger's line, and from thence to a corner post standing on the east side of said plantation near Roger's fence, and from thence west to white oak boundra, and from said boundra east to a maple standing in the swamp next to Warren Prettyman's land, and from thence west to a maple standing in said swamp near round hole, and from said maple nearly a south course to the white oak corner, the place of beginning, thence the same course and twenty perches across the county road.

I will to my son Thomas all my lands lying on the south side of said county road, beginning at the said marked white oak standing on said County road, and thence running twenty perches nearly a south course, and from thence with a straight line across my home plantation to a gum corner standing in the swamp, next to Dixon Harris' land.

I will to my son John all my land lying on the north side of the County road, beginning at the said marked white oak, and thence with the said road west except one acre, where my garden now stands, which I will to my son Cornelius.

I will to my son Cornelius all my home plantation lying on the south side of said County road up to my son Thomas' line, and now my will and meaning is that if in case any of my sons, William, Thomas, John and Cornelius dies without a lawful heir, that the land or lands of him or them so dying shall be divided among the survivor or survivors of them, each to share and share alike.

I will to my eldest daughter Levinah Jones one shilling and no more of my estate.

I will to my two daughters Rhodah and Comfort, one hundred dollars each, to be paid by my four sons, William, Thomas, John and Cornelius, each of them to pay fifty dollars to the said Rhodah and Comfort, when they shall arrive at the age of twenty-one years.

I will all my moveable estate to be sold, and after paying out of it all my just debts, then my will and meaning is that the balance of it be divided equally among my six children, William, Thomas, John, Cornelius, Rhodah and Comfort, each to share and share alike, and I leave my two sons William and Thomas, my administrators.

JOHN PRETTYMAN.  [SEAL.]

Signed, sealed in the presence of us.
>    ROBERT BARR,
>            her
>    SUSANNA x PIPER,
>            mark.
>    NATHANIEL P. HARRIS.

The devisees of the testator were all living at his death.

Since that time it is agreed that three of the four sons—who alone were devisees of the real property—have departed this life, viz : William, about the year 1878, in the West; John in 1884; and Cornelius in 1889. The lessor of the plaintiff is one of the children and heirs at law of Cornelius, and asserts that his uncle Thomas has also departed this life and without leaving any issue, and intestate. The brothers William and John respectively left issue. The suit is brought by the plaintiff's lessor to recover his share of the real estate demised by the testator to his said son Thomas, or rather to that portions of it comprising about five acres which said Thomas conveyed in the year 1874 to one John Rogers who in his turn sold it unto one Hiram S. Short, as whose property along with other realty it was sold by the Sheriff then of the county of Sussex, and purchased by the tenant in possession and defendant in this suit—John W. Short. It has been sufficiently shown that Rogers and Shorts have all had uninterrupted possession of the land under their several purchases, since the deed from Thomas Prettyman to Rodgers in 1834. It is agreed between the counsel for the parties on both sides that the estates devised by the testator, John Prettyman, to each of his sons are estates tail, with a contingent remainder over to the survivor or survivors of them in case of the death of one or more of them without lawful issue—that is child or children, or the issue of such, at the time of his death. There is proof before the jury, of the sufficiency of which for that purpose it is for the jury to decide that Thomas never had any children though he was married—his wife having left him and gone off with some one else many years before the time when his family last had any knowledge of him. It appears by the proof that he went out West many years ago, but returned to Delaware about twelve years or more past, and lived here without family for two or three years, when he annunced his purpose to go West again, and this time to Oregon. After he left he was heard from at Hamburg, Iowa—where one of his sisters corresponded with him, and it was kept up for two years cr more when all communi

cation with him ceased, as he made no reply to the letters mailed to him.  Correspondence was then had with the postmaster at Portland, the capital of Oregon, with a view to ascertain if he could be found there, or any tidings could be had of him.  The answers of the postmaster are in evidence before you, and by them there appears to have been no knowledge by the postmaster of any such person as Thomas Prettyman.  It then became understood in the Prettyman family and believed, that the said Thomas was dead, and such belief obtains in it now.  This state of things was proved before the jury by members of the family.  On the 7th day of April, 1890, this action was brought by the plaintiff's lessor to recover what he claims to be his share, as one of the children of his father Cornelius Prettyman, one of the four sons and devisees aforesaid of the testator John Prettyman aforesaid, of the tract of five acres, part of the land devised to Thomas by his father, and which part was sold by Rogers to Hiram W. Short and is now held by the tenant in possession John W. Short, above set forth—which share the said lessor, alleges is two equal undivided third parts of that small tract. It is not denied by the defendant that said share is the proper one, provided the claimant is entitled to recover anything whatever in this action—which the defendant denies.  Such denial is put upon two grounds.  The *first* is that there is no sufficient proof before the jury to justify them in determining that Thomas Prettyman is dead at all: and *second*, that if he be dead, or is so to be considered, then the plaintiff is barred by the act of limitations taking away the right of entry after the lapse of twenty years from the time when such right first accrued, which was at the death of John Rodgers, who, as the defendant contends, acquired only an estate for his own life by the deed to him from Thomas Prettyman. It is not disputed by the plaintiff that such deed did only convey a life estate, but he contends that the estate conveyed was for the grantor's own life, and not for that of the grantee.  The difference is this—that upon the defendant's contention there would be support for the plea of the act, as the death of John Rodgers took

place by the proof, so far back as 1861; whereas upon that of the plaintiff—that the deed by Thomas Prettyman to John Rodgers operated an estate for the grantors own life, there would be none, it appearing as he contends he has shown to the jury, that Thomas was alive within the statutory period—that is, within twelve or fifteen years. This disagreement raises a question of law, which we are called upon to instruct you about. The deed from Thomas to John Rodgers which is in proof before you, was intended we doubt not to transfer from the grantor and his wife who united with him in it, all their right and title not only to the land mentioned in it (of which two small parcels of five acres and odd perches, the subject matter of this suit is part) but also all which might come to him in the parcels of land devised by his father to his brothers, contingent upon the death of any of them without leaving a lawful descendant. The language of the deed, as we think, shows this conclusively : but on account of the ignorance of the draughtman of the necessity of using apt words for that purpose, their object was defeated entirely ; and the scope and effect of the deed were only to transfer a bare freehold interest, that is an estate for life. For which life, that of Thomas, or that of Rodgers, is the question—the right to maintain this suit (if it be good otherwise) depending upon it. We have said to you that we think the object of the grantors was to convey to Rodgers, whatever they could vest in him by a deed. Now as this right which Thomas derived from his father's will, was an estate tail, they had power, by the law of this State, to convert that limited estate into an absolute one by a fee-simple deed, duly acknowledged and recorded according to the statute : but the ignorance of the draughtsman of which we have spoken, did not enable him to use fit language for that purpose. It is a rule of law, of long standing, that no fee can be created by a *deed* without the use of the word *heirs* as a word of limitation. I speak in general terms. Such term is not used in this deed ; and therefore, as both sides admit, no estate beyond a life term passed by it. To repeat—for which life? We have

pointed out to you the evident object the grantors' had, as we think, to part with all such interest in the land as they might pass by deed. They had no power, by the instrument they ignorantly used however, to give more than a life estate. To determine which the grantee had a right to claim, is to be decided by the consideration—which was best, under the circumstances, for him to have. All the grantors could transfer to him by their deed delivered to him, was an estate for the life of Thomas Prettyman. It is true, if they had so expressed themselves in the deed, they might have indicated a purpose to convey to Rodgers an estate for his life; but such estate could not endure beyond the life of Thomas, unless a different form of conveyance had been adopted for that purpose : whereas if Rodgers should die, leaving Thomas, the life estate would continue, and by our statute would be part of the assets of the estate of Rodger's to be included in the inventory of his executor or administrator. As therefore a grant of estate to Rodgers for his own life could not avail beyond that life, whereas, a grant for the life of the grantor might, the latter would be more valuable than the former. In the absence of any language fixing the duration of the term, and of the existence of the rule that a deed is to be taken most strongly against the grantor—that is him making it—the better estate, where there is nothing to the contrary, will pass; in this case an estate for the life of Thomas Prettyman.

This result is not only, as we think, the true exposition of the law in relation to grants without words of legal limitation, as to the case here, but is greatly supported by the before expressed evident purpose of the grantors, by their deed, to convey all they could. We therefore instruct you gentlemen of the jury, that the deed from Thomas Prettyman and wife to John Rodgers conveyed to him an estate in the land embraced in it for the life of said Thomas; and therefore, as the right to sue for it could not accrue until the death of Thomas without issue, which death is to be claimed by the plaintiff did not happen until within the last fifteen years, the plea of the act of limitations will not avail the defendant.

But the plaintiff cannot recover in this action unless you are of opinion, from the testimony in the case, that Thomas Prettyman is dead, and that he left no descendants—that is issue—to survive him. The rule is, " that where a person is once shown to have been living, the burden of proof lies upon the party who asserts his death. But after seven years, without intelligence concerning the person, the presumption of life ceases, and the burden of proof is devolved on the other party." *Greenleaf on Ev.*, Vol. 1, Sec. 41. It has been asserted by the testimony of the witness Nutter Marvel, that Thomas' wife left him and went off with another man, and that he, himself, went out to the West where the witness corresponded with him; that he returned about 15 or 16 years ago (others say twelve or fifteen years ago), and there is a general consensus of statement by the members of the family who testified before the jury, that he remained in Delaware for two or three years without any of the family whatever being with him ; in fact it was stated by the witnesses that he was reputed in the family to be unmarried and without issue. While here he was apparently without any home or fixed place of residence elsewhere—inferrible from the fact that he was apparently, and, according to repute in the family as testified to by members of it, without any family of his own. Now in such cases, the rule is this—that where a person has either no fixed place of residence, or has two homes, and the scale is almost even balanced between them, the legal presumption is in favor of what is called the *domicil of origin,* by which is meant not the place where he may chance to have been born, but the home of his parents. *Taylor on Ev.*, Vol. 1, Part 1, page 227. In this case both the place of the birth of Thomas and home of his parents, were in this State; at least that would seem to result from the proof and circumstances of the case, though no actual proof was made of the place of his nationality. But this is not, under the circumstances very material, nor at all as important as the fact of the home of his parents; it was that which gave him, if you think the proof of double residence or two homes, almost evenly balanced between

them, a domicil of origin here, if you think he resumed his prior domicil when he came back from the West twelve or fifteen years ago, and remained here two or three years, as was testified before you. Should you come to the conclusion, that he had a home here which he left, with the avowed purpose of going back to the West, and to Oregon, where he had not lived before. If you are satisfied with the proof of this fact, then such return was not to resume his old home, but to find a new one. If this is true, then he was in the situation of only having one home, the origin of domicil, going away to obtain another.

There was then no double home; and the proper place to originate inquiries about him when the correspondence alleged and testified to with his family, ceased was the family home here, whence, if you believe the statement of the witnesses on that point, they did originate, and without success. After about two or three years from the time when he returned to the West, no letters came from him, as was testified to by the witnesses; nor did they ever hear from him any more. In reply to letters addressed to the postmaster at Portland, Oregon, the capital of that State, as I have said before, replies came that he had no knowledge of any such person as Thomas Prettyman, or words to that effect. Now it is for you to say whether, under the circumstances, all the inquiry made that you think was necessary to ascertain whether Thomas was alive or not. No rule has been laid down upon the subject that I have seen: but of course, there should be sufficient proof laid before the jury by the party claiming a right depending upon the death of another, to show that he is dead in fact, or that a reasonable effort has been made and without success, to ascertain whether he is dead or alive. If you are satisfied, from the proof before you, that such effort was made by the family and that nothing has been heard from Thomas within seven years next preceding the time of bringing the suit in this case—the 7th of April, A. D., 1890, thus you are as much warranted in treating Thomas as dead, as if you had actual proof of a witness who knew him that he saw him die.

But before you adopt the presumption of death, you should be satisfied that all the circumstances in proof point to the death of Thomas, and that he has not been living within seven years before the suit was brought. And to give the plaintiff a right to your verdict, if you are not satisfied from the proof of Thomas' death, you must also be satisfied that he died without any descendants of his own.

The learned counsel for the defendant has called our attention to the fact, that there was no proof made by the plaintiff that any letters alleged to have been sent to Thomas by any member of the family and to which it was testified no answers were ever received, were returned to the writer through the dead letter office at Washington; and he insists that such circumstances justifies the inference, or presumption, that no such letters were in fact sent. Now, no evidence was furnished us by him as to what is the law in relation to dead letters—he relying, perhaps, upon the fact that the court is bound to notice judicially, without actual proof what such law is. It is true, the court is so bound; but it can hardly be expected to treat the subject with proper intelligence without the law and regulations under it before us. But we can say to you, as of any other fact we are bound judiciously to take account of and which is not actually shown—that according to our understanding of the post office law, letters received at an office, addressed to a party, who does not call to inquire for them, and who is unknown at the post office, are first advertised a certain length of time, and if not called for at the end of such time, are required to be forwarded from the office of the address to the dead letter office at Washington, where they are opened with a view of ascertaining the name of the sender, to whom they are to be returned. This is a general statement of what we take to be the law of Congress upon the subject of dead letters- But we have also understood, that by the law, or regulations of the post office department for its administration, this duty of return of letters to the sender does not apply to all such indiscriminately, but to those only which appear to be of

such importance that they should be returned. If they are not, they are destroyed. I have myself seen the regulations upon that subject; but they seemed to contain inconsistent provisions with respect to dead letters, which would require interpretation by the practice under them at the post office department. We have no proof of what that practice in fact is, and we have been furnished with no suggestion upon the subject. . So that we are, in fact, in a state of inability to inform you what the practice aforesaid is. But taking it to be, broadly, that such letters as were here alleged to have been written, ought to have been received back by the writer, from the dead letter office, there would then be a presumption to oppose to the positive testimony of the sending of the unanswered letters by the family—a very important fact, but not conclusive against such testimony. It is for you to say whether a mere letter from one member of a family to another, is, of itself, of any special importance to the writer of it, so as to make it proper that it should be returned to him. In the absence of proof upon that subject of the usage, or practice under the post office l aw, you are to decide that point according to your best judgment.

The proof in this case is all for you to deal with. If after weighing and considering it carefully you are satisfied the plaintiff has made out his case upon the testimony, you should give him your verdict: otherwise it should be given to the defendant.